## 10959

OWINGS v. GRAHAM *ET AL.*

OWINGS v. OWINGS *ET AL.*

(113 S. E. 279)

1. TRUSTS—CONVEYANCE TO PARTNER BY FIRM DEBTOR HELD IN TRUST FOR THE FIRM.—Where a landowner who was largely indebted to a partnership conveyed his land to one of the partners at the solicitation of the other and active partner, under a contract whereby the partnership .assumed certain obligations, and the parties admitted the deed was made to that partner and the mortgage on the premises assigned to the other partner to prevent a merger, the land conveyed was held by the grantee as trustee for the partnership.

2. TRUSTS—PARTNER HELD NOT SHOWN TO HAVE TAKEN ASSIGNMENT OF MORTGAGE ON LAND OF FIRM'S DEBTOR FOR THE FIRM.—Where one partner took an assignment of a mortgage covering land owned by a debtor of the firm two years before a settlement was made with the debtor whereby he conveyed his equity in the land to the other partner in consideration of obligations assumed by the firm, but evidence showed that the money paid for the assignment of the mortgage was paid by the individual partner to whom the assignment was made, and there was no proof that it was other than an individual transaction, the mortgage cannot be considered as held by the partner in trust for the firm.

3. TRUSTS—MORTGAGE ASSIGNED TO PARTNER WHICH HAD BEEN ASSUMED BY ANOTHER PARTNER IN TAKING THE PROPERTY FOR THE BENEFIT OF THE FIRM IS HELD FOR THE FIRM.—Where land owned by a' debtor was conveyed by him to one of the partners of the creditor firm, who held it in trust for the firm, and who assumed a mortgage thereon, the assignment of the mortgage to the other partner as part of the consideration for the settlement in which the land was conveyed makes him a trustee of the mortgage for the benefit of the firm.

4. MORTGAGES—DO NOT MERGE WITH EQUITY IF INTEREST OF OWNER IS OTHERWISE.—Where the holder of a mortgage on land subsequently acquires the equity in the land, the legal estate and equity did not merge if it is the intention of the parties they shall remain separate, and such is presumed to be the intention where it is' to the interest of the holder of the mortgage and equity to preserve the mortgage to defeat intermediate titles.

5. MORTGAGES—MORTGAGE ASSIGNED TO ONE PARTNER FOR FIRM HELD NOT TO HAVE MERGED WITH EQUITY CONVEYED TO THE PARTNER FOR THE FIRM.—Where land owned by a firm debtor was conveyed to

one member of the firm, who held it for the benefit of the firm, and at the same time a mortgage thereon was assigned to the other member of the firm, also for the benefit of the firm, the purpose of the separate holdings being to prevent a merger, which was to the interest of the firm in order to defeat intermediate judgment liens against the property, there was no merger of the mortgage and the equity.

6. MORTGAGES—EVIDENCE HELD NOT TO SHOW PAYMENT CLAIMED TO HAVE BEEN MADE BY MORTGAGOR.—Evidence that a mortgage was paid by the funds of a member of the firm to which the mortgagor was indebted, who took an assignment of the mortgage, and that the mortgagor was not charged with any part of the money paid for the assignment, *held* not to sustain the mortgagor's claim that a part of the money paid for the assignment was from the funds standing to his credit in the firm's accounts.

7. FRAUDULENT CONVEYANCES—CREDITOR CANNOT ATTACK OWN CONVEYANCE AS VOID PERSONAL ASSIGNMENT.—A creditor cannot attack the validity of his own deed as an illegal preference under the assignment law, which would be a reliance by him upon his own complicity in an unlawful act.

8. JUDGMENT—JUDGMENT CREDITORS WHOSE CLAIMS ANTEDATE CONVEYANCE HAVE NO INTEREST IN SETTING IT ASIDE.—Judgment creditors of a landowner whose claims antedate a conveyance by the owner have no interest in setting aside the conveyance as an illegal preference under the assignment law.

9. FRAUDULENT CONVEYANCES—TRANSFER OF CHATTELS TO CREDITOR HOLDING MORTGAGES FOR MORE THAN VALUE IS NOT A VOID PREFERENCE.—Judgment creditors cannot attack as an illegal preference a transfer by the debtor to another creditor of all of his personal property on which that creditor held chattel mortgages for amounts exceeding the value of the chattels, since it is essential to a fraudulent conveyance that the subject-matter of it should be something out of which the creditor could otherwise have realized all or a portion of his claim.

10. DEEDS—EVIDENCE HELD NOT TO SHOW CONVEYANCE TO CREDITOR WAS PROCURED BY FRAUD.—Evidence that a debtor was induced to convey real and personal property to his creditor in return for the creditor's agreement to furnish the debtor and his partner with certain supplies if they continued in the business of farming during the coming season, and that the debtor's partner withdrew from the enterprise before the season began, so that the creditors were under no obligation to furnish the supplies, *held* not to show that the conveyance to the creditors was procured by fraudulent misrepresentations and connivance with the debtor's partner.

11. Deeds—Breach of Contract by Purchaser is not Ground for Annulling Conveyance.—Even if a creditor subsequently breached his contract to furnish the debtor certain supplies -if the debtor would convey his land and chattels to the creditor, the debtor had his remedy at law for the breach, and it was not a ground for annulling the conveyance.

12. Judgment—Evidence Held to Show Assignments to Stranger Were Procured by Debtor for Himself.—Evidence *held* to show that assignments of judgments to a third person, the negotiations for which were conducted by the debtor who represented that he was endeavoring to settle the judgments against him with money advanced by a friend so that he could again engage in business, and which assignments were executed in blank and sent to the debtor, who filled in the name of another as assignee, were in fact assignments for the benefit of the debtor himself, so that the assignee had no interest therein except a lien for the amount advanced by him.

13. Estoppel—Debtor Procuring Assignment is Estopped From Asserting Judgment Lien Against Purchaser From Him With Warranty.—A debtor who had conveyed his lands, which were subject to judgment liens, with a general warranty, is estopped, after procuring for his own benefit assignments of the judgments to a third person, from asserting the liens of those judgments against his purchaser.

14. Judgment—Creditors Cannot Claim Assignment Was Pretensive Without Returning the Consideration.—A creditor who had agreed to give an assignment of his judgment for a stated sum and had received from the debtor the amount agreed to be paid therefor cannot claim the benefit of the invalidity of an assignment of the judgment as merely pretensive without having tendered back the consideration for the assignment.

15. Judgment—Held Extinguished by Assignments to Friends of Debtor for His Benefit.—Judgments rendered against a landowner who subsequently conveyed the land subject to the judgment liens with general warranty are extinguished by the subsequent assignment thereof to a friend of the judgment debtor for his benefit, except in so far as the assignee had a lien for the amount advanced for the assignment.

16. Mortgages—Creditor Held Entitled to Both Rents and Interest on Mortgages.—Where one creditor of a landowner acquired the equity of the owner in the land and also an assignment of the mortgage covering the land, which did not merge with the equity because of judgment liens in favor of other creditors, that creditor was entitled to interest on the mortgage debt and also entitled as owner of the equity to the rents from the land as against

other judgment creditors who delayed for several years attempting to enforce their judgment liens against the land.

17. JUDGMENT—ASSIGNMENT PROCURED BY ATTORNEYS HELD NOT INTENDED TO BE FOR BENEFIT OF DEBTOR.—Evidence *held* not to show that assignments of judgment procured by attorneys who represented they were acting for the assignee were in fact procured for the benefit of the judgment debtor, though the attorneys had also represented the judgment debtor, and the debtor himself had procured other assignments for his benefit to the same assignees.

*On Petition for Rehearing*

18. APPEAL AND ERROR—ORDER FOR REARGUMENT BY EQUALLY DIVIDED COURT DOES NOT AFFIRM JUDGMENT.—When it appeared after the first arguments that the Court as then constituted was equally divided and a reargument was ordered, the opinion not having been filed, but being lodged with the clerk for information of counsel, the judgment was not thereby affirmed by a divided Court.

19. APPEAL AND ERROR—OBJECTION TO ILLEGAL APPOINTMENT OF SPECIAL SUPREME COURT JUSTICE SHOULD BE MADE BEFORE REHEARING.—An objection that an appointment of an acting Associate Justice was illegal, made on rehearing, comes too late.

Before GARY, J., Laurens, September, 1920. Judgment dismissing the first case affirmed. Judgment in second case reversed and remanded.

Separate actions by Mrs. M. A. Owings against H. M. Graham and another, to enjoin the enforcement of certain executions, and by M. J. Owings against Mrs. M. A. Owings, D. H. Counts, and others to foreclose mortgages executed by defendant Counts upon the land subsequently conveyed to Mrs. M. A. Owings. From a decree dismissing the first action and finding against the plaintiff in the second action, and settling the relative rights of the several defendants, the plaintiffs and the defendants, D. H. Counts and others, appeal.

The complaints and answers and the decree of the Circuit Court were as follows:

*Complaint of M. A. Owings v. H. M. Graham*
*and S. C. Reid. Sheriff:*

(1) That she is owner and in possession of the Coleman place of 313 acres in Laurens County, conveyed to her

by D. H. Counts, January 9, 1915, by deed recorded in Book 39, page 80.

(2) That prior to the conveyance Nashville Saddlery Company, Montgomery-Moore Manufacturing Company, Parker Manufacturing Company, Georgia Chemical Company, and Hughes Buggy Company recovered judgments against D. H. Counts, and issued executions, and the Sheriff at the instance of the creditors had proceedings to set off homestead to Counts, and the appraisers valued this land at $7,500.00, and made their return, which was accepted by all parties as the true value, and no exceptions were taken.

(3) That at the time of the appraisement the land was encumbered by mortgage of $5,000.00 in favor of Lucas, and $6,000.00 in favor of Enterprise Bank, prior to the judgments, and the land was not worth the mortgage indebtedness and homestead.

(4) That after the filing of the return of the appraisers she, on advice of her counsel, purchased said land at the price of $5.00 and the assumption of the mortgage indebtedness, which was full value for the land, and her attorney, who was also the attorney for D. H. Counts in the transaction, prepared the deed, which she accepted, relying on his advice, and has ever since been in possession of the land.

(5) That the mortgages remain unpaid, and her attorney advised the purchase thereof by the present holder, and prepared some of the transfers.

(6) That subsequently H. M. Graham, styling himself assignee of said judgments, issued executions thereon and lodged same with the Sheriff, though there is no record of any assignment of said judgments to H. M. Graham.

(7) That the Sheriff has attempted to levy on the lands herein described under said executions and has advertised the lands for sale.

(8) That she is informed and believes that D. H. Counts has recently purchased or paid off said judgments and if they are assigned to Graham, such assignment was for the purpose of having same levied upon the land, as Counts has asserted and boasted that he would see that the plaintiff and those holding under her should not have the premises longer.

(9) That the purchase or payment of said judgments by Counts is a satisfaction of same; that by the acquiescing in the homestead proceedings by the judgment creditors, and the conveyance of the land to the plaintiff, all of the interest of D. H. Counts in said land, including his homestead, passed to her free from any right of levy and sale under these executions; and the executions and attempted levy of same constitute a cloud on plaintiff's title, which she desires to have removed, and, if lands are sold under the executions before the rights of the parties are ascertained, great and irreparable damage will be done the plaintiff, and Graham's alleged executions enforced by levy on and sale of the lands of the plaintiff herein described.

Prayer that the judgments and executions and attempted levy be declared null and void, in so far as lands described are concerned, and for injunction to restrain Sheriff from selling the lands under said executions and judgments.

*Answer of H. M. Graham to Complaint*
*of Mrs. Owings:*

Admits allegations of Paragraphs 1, 6, 7, and 10 that judgments were obtained against Counts and that he is head of a family; denies Paragraphs 8 and 9, 3, 4, and 5; that the judgments are liens on the land; that prior to March 1, 1918, he purchased the judgments and they were assigned to him, and he now owns them and a number of others against D. H. Counts; that Counts owned a valuable house and lot in Laurens in March, 1914,

in which he and his family resided; that Counts claimed homestead in the house and lot in an action by Carolina Savings Bank & Trust Co. v. Himself, commenced April 29, 1915, to which action the judgment conditions were parties.

The answer of S. C. Reid was formal. A motion for temporary injunction to restrain sale during pendency of action was made before Judge Shipp at Abbeville, and on hearing same the temporary injunction was granted, restraining the Sheriff from selling the lands under execution pending the litigation.

Thereafter, on —— day of ——, 1918, on motion of the defendant, H. M. Graham, said order was modified by providing that same should apply only to executions issued by the said H. M. Graham.

Thereupon, on —— day of ——, 1918, the defendant, M. W. Dendy, claiming to be the owner and assignee of judgment of C. H. Russell & Son, lodged an execution with the Sheriff and caused same to be levied on the Coleman place, and advertised same for sale thereunder on sales day in June, 1918.

The plaintiff, M. J. Owings, thereupon commenced the second action herein against Mrs. M. A. Owings, D. H. Counts, H. M. Graham, M. W. Dendy, and the judgment creditors of D. H. Counts.

### Complaint of M. J. Owings.

### First Cause of Action.

(1) The execution and delivery by D. H. Counts to Lucas note for $5,000.00, with interest and attorney's fees.

(2) The execution and delivery by Counts as security for said note a mortgage over Coleman place of even date with the note.

(3) That mortgage was conditional for payment of the note.

(4) That Mrs. Counts renounced dower.

(5) That Counts paid interest on the note to its maturity November 15, 1914, and made no other payments thereon.

(6) That after maturity M. J. Owings agreed to, and did, purchase the note and mortgage from the holders thereof, who transferred same to him.

(8) That on January 9, 1915, D. H. Counts conveyed the lands to the defendant, Mrs. M. J. Owings, who, under the conveyance, claims an interest in the land.

Ninth and tenth set out that Nashville Saddlery Company and others, naming them, are judgment creditors of D. H. Counts, and as such claiming an interest in the land.

(11) That defendants, H. M. Graham and M. W. Dendy, claim some interest in the land.

(12) That no payment has been made on the indebtedness to the plaintiff by any of the parties; that the condition of the mortgage has been broken; that it is necessary to place same with attorneys for foreclosure and sale; and that there is due thereon the sum of $5,000.00 with interest from November 15, 1914, at 8 per cent. per annum, payable annually as provided in the note, and 10 per cent. on the amount due as attorney's fees. And the mortgage is the first lien on the premises.

## Second Cause of Action.

(1) Alleges execution and delivery by Counts on January 5, 1911, note to Enterprise Bank for $1,712.20, due November 1, 1911, with interest after maturity at 8 per cent. per annum and 10 per cent. on amount due. as attorney's fees.

(2) The execution and delivery of a similar note for $4,287.80 on same day, same maturity, payee, maker, interest, and attorney's fees.

(3)   The execution and delivery of mortgage over the Coleman place on same day as security for the two notes.

(4)   That Mrs. Counts renounced dower.

(5)   That the mortgage was conditioned for payment of the notes.

(6)   That mortgage was duly recorded.

(7)   That on November 5, 1912, the bank for value assigned the notes and mortgage to the plaintiff, there being due at the time on the first note the sum of $1,712.-21, and on the second note the sum of $3,797.61.

(8)   That on January 9, 1915, Counts conveyed in fee simple the Coleman place to the defendant, Mrs. M. A. Owings, who is the owner thereof.

(9) and (10)   That Nashville Saddlery Company and other named creditors have judgments against Counts and claim interest in the lands.

(11)   That Graham and Dendy claim an interest in the land.

(12)   That no payments have been made to the plaintiff on the indebtedness condition of mortgage broken, amount due with interest and attorney's fees, and that mortgage is second lien on premises.

### Third Cause of Action.

(1)   That plaintiff is the owner and holder of the notes and mortgages described in first and second causes of action.

(2)   That Nashville Saddlery Company and others named are judgment creditors of Counts, obtaining their judgments at different times from 1912 to 1914, inclusive.

(3)   That Graham and Dendy claim to be assignees and owners of some of the judgments.

(4)   That Graham has issued executions levied on the Coleman place and advertised same for sale.

(5)   That Mrs. M. A. Owings had brought an action

to enjoin the sale, and temporary injunction had been granted.

(6)   That subsequently M. W. Dendy had issued an execution levied on the land and advertised same.

(7)   That Graham claims to own other judgments than those on which executions were levied.

(8)   That the assignments of the judgments to Graham and Dendy are pretensive and were obtained at the instance of the judgment debtor, D. H. Counts, as the real party in interest in payment of the judgments, and that they are paid and are not liens on the lands.

(9)   That Counts claims to have settled the judgments, except that of Mitchell-Lewis Motor Company, at 10 cents on the dollar, and negotiations are pending for settlement of it on same basis.

(10)   That Counts, with intention to annoy plaintiff, instead of having the judgments satisfied of record, caused them to be assigned to Graham and Dendy, and possibly to others, in order that executions might issue from time to time; that lands might be sold under same and plaintiff harassed in his rights of foreclosure, and for the purpose of casting clouds upon the title and defeating plaintiff's mortgage, and forcing lands to sale before rights of parties could be ascertained, and forcing plaintiff to bring numerous actions in order to protect his rights under his mortgages; that plaintiff has no adequate remedy at law, and defendants should be enjoined for selling lands or establishing claims in any other action than this, all being made parties; that plaintiff will otherwise suffer irreparable damages.

Prayer for sale of lands for payment of amounts due on notes, for injunction, and for distribution of proceeds of sale, after payment of costs expended and plaintiff's indebtedness, amongst the parties in interest in accordance with their rights.

27 S. C.—120.

Thereupon, on motion, Judge Sease granted an order restraining the defendants from selling the lands under execution or prosecuting their claims in any other action.

### Answer of D. H. Counts.

He denied the allegations of first and second causes of action stated in the complaint not admitted, and admitted the allegations of Paragraphs 1, 2, 3, 4, 5, 8, and 11 of first cause of action, and 1, 2, 3, 4, 5, 6, 8, and 11 of second cause of action and that he paid interest on the Lucas mortgage up to November 14, 1914; that he had no knowledge or information sufficient to form a belief as to the truthfulness of allegations of Paragraphs 7, 9, and 10 of first cause of action, and 9 and 10 of second cause of action.

Answering the third cause of action, he admits the allegations of Paragraphs 2, 3, 4, 5, 6, and 7, has no knowledge or information as to Paragraph 1, and denies Paragraphs 8, 9 and 10.

Further answering, he alleges:

(1) That he paid the indebtedness on the Lucas mortgage debt up to March 15, 1914.

(2) That he made payments on the Enterprise Bank mortgage debts, reducing same to $3,842.00, and paying interest on $1,200.00 to December 1, 1914, and on $1,442 to December 15, 1914.

(3) That M. J. Owings and Mrs. M. A. Owings are and were partners under the name of Owings & Owings.

(4) That in January, 1915, the said firm of Owings & Owings claimed and contended that this defendant, D. H. Counts, was largely indebted to said firm, and the said Owings & Owings proposed and agreed that, if this defendant, D. H. Counts, would sell and deliver to Owings & Owings certain personal property and convey the Coleman place, the mortgaged premises described in plaintiff's first and second alleged causes of action, to Owings &

Owings, that they, the said Owings & Owings, would cancel all their pecuniary claims against this defendant, D. H. Counts, and would pay the mortgage indebtedness of this defendant, D. H. Counts, described in plaintiff's first and second alleged causes of action, and they further agreed to furnish D. H. Counts and J. Q. Brown, partners farming under the firm name of Counts & Brown, certain agricultural supplies with which to enable them to run the farm cultivated by them in Fairfield County, etc., and this defendant thereupon accepted said proposition, and in good faith delivered to said Owings & Owings the said personal property, and, under advice of counsel, conveyed the Coleman tract of land to the defendant, Mrs. M. A. Owings, and gave Owings & Owings and Mrs. M. A. Owings possession of same in January, 1915; that said personal property was delivered to the said firm of Owings & Owings, and the said deed executed and delivered to Mrs. M. A. Owings in consideration of and upon the agreement that this defendant's indebtedness to Owings & Owings should be cancelled, and that the said Owings & Owings and Mrs. M. A. Owings should pay the said mortgage indebtedness of this defendant, D. H. Counts, described in plaintiff's first and second alleged causes of action, and would furnish the said Counts & Brown certain agricultural supplies with which to enable them to run the farm cultivated by them in Fairfield County, etc.; that the nominal consideration of $5.00 stated in the deed was not the real consideration for the deed, and the said $5.00 was never paid, but the real consideration was the agreement of Owings & Owings to cancel this defendant's, D. H. Counts', indebtedness to said firm of Owings & Owings, and that the said Owings & Owings and Mrs. M. A. Owings would pay this defendant's mortgage indebtedness as alleged in plaintiff's first and second alleged causes of action, and would furnish the said Counts & Brown certain agricultural supplies with

which to enable them to run the farm cultivated by them in Fairfield County, and that, under advice of counsel, the deed to said mortgaged premises was made to Mrs. M. A. Owings, and the mortgages were assigned to M. J. Owings, for the purpose of preventing the mortgages from being merged into the title.

(5)   That Owings & Owings are receiving $2,500.00 per annum as rents and profits from Coleman place.

(6)   That it would be unlawful and inequitable to allow interest and attorney's fees to the plaintiff.

(7)   That 10 per cent. attorney's fees would be excessive.

### *Answer of H. M. Graham.*

Admits allegations of Paragraphs 1, 2, 3, 4, and 5 of first cause of action, and that D. H. Counts paid interest on Lucas debt to November 15, 1914, and that Graham and Dendy claim an interest in the land; denies Paragraph 12, and demands proof of Paragraphs 7, 8, 9, and 10, he having no knowledge or information sufficient to enable him to form a belief as to same; admits allegations of Paragraphs 1, 2, 3, 4, 5, and 6 of second cause of action, and that he and Dendy claim an interest in the land; has no knowledge or information sufficient to form a belief as to allegations of Paragraphs 8 and 10, and denies on information and belief Paragraphs 7 and 12; denies allegations of Paragraph 9; admits allegations of Paragraphs 2, 4, 5, 6, and 7 of third cause of action, and that he and Dendy claim to be assignees and owners of some of the judgments; denies allegations of Paragraphs 8, 9, and 10, and has no knowledge or information sufficient to form a belief as to Paragraph 1.

Further answering, he sets up the same matter as that set up in the further answer of D. H. Counts, and in addition thereto alleges that Nashville Saddlery Company, Parker Manufacturing Company, Montgomery-Moore

Manufacturing Company, Hughes Buggy Company, Georgia Chemical Works, Mitchell-Lewis Motor Company, Franklin Buggy Company, and Navassa Guano Company recovered judgments against D. H. Counts during the years 1912, 1913, and 1914, aggregating $5,917.33 and costs, which judgments were duly entered and are liens on the lands described in the complaint; that prior to March 1, 1918, he purchased the first five judgments, and they were assigned to him, and he is the owner thereof; that since March 1, 1918, and prior to the commencement of this action, he purchased the last three judgments, and they were assigned to him, and he owns same; that before the commencement of this action he offered to buy the two mortgages from the plaintiff, offering "to pay the full amount and more than the full amount of the indebtedness of D. H. Counts secured by said mortgages," he at the time being the owner of the judgments and offering to buy in order to avoid litigation; that he is still willing to pay the plaintiff the amount due on the mortgage indebtedness.

*Answer of M. W. Dendy.*

Admits allegations of Paragraphs 1, 2, 3, 4 and 5 of first cause of action, that Counts paid interest on said indebtedness to March 15, 1914; that Dendy and Graham claim some interest in the lands; that he has no knowledge or information sufficient to form a belief as to Paragraphs 7, 8, 9, 10, and 12; admits allegations of Paragraphs 1, 2, 3, 4, 5, and 6 of second cause of action, that he and Graham claim an interest in the lands; that he has no knowledge or information sufficient to form a belief as to Paragraphs 8 and 9; denies allegations of Paragraphs 7 and 10; further answering, sets up same matter as that set forth in further answer of D. H. Counts, and in addition thereto alleges that C. H. Russell & Son recovered judgment against D. H. Counts March 20, 1914, for $2,412.82 and costs, which was duly entered and was and is a lien on the lands de-

scribed in the complaint; that before the commencement of this action the judgment was sold to him, and he is the owner of it.

### Answer of Mrs. M. A. Owings:

(1)    Admits allegations of complaint.

(2)    That she is owner of the land described in complaint, purchasing same from Counts by fee-simple, general warranty (except against the mortgages) deed on January 9, 1915, duly recorded.

(3)    That the judgments were obtained against D. H. Counts before the conveyance of the lands to her by him, and executions had been issued on March 6, 1914, and at their instance homestead appraisers were appointed to appraise and set off homestead to D. H. Counts, then and now the head of a family, and under said proceedings the lands were appraised at $7,500.00. Return was made, duly served and filed, and no exceptions taken thereto, and the valuation placed upon the land by the said appraisers was taken and accepted as the value by all interested therein, and no appeal was ever taken, and they are now estopped from questioning said appraisement, and at that time said lands were incumbered by mortgages described in the complaint amounting to more than the value of the lands; that she assumes the payment of the mortgages as part of the consideration for the purchase of the lands, and the judgment creditors took no further steps to enforce payment of their judgments or enforcing the executions in the Sheriff's hand.

(5)    That her purchase was after the filing of the return of the appraisers in reliance on the advice of her attorneys, who prepared the deed and who advised her and Counts in the transaction, and she accepted the deed prepared by her said attorneys, took possession of the lands, and has ever since been in possession thereof.

(6)  That the mortgages which were over the lands when she purchased remain unpaid, and her attorneys, she is informed and believes, advised the purchase of said mortgages by the present holder, the plaintiff, and prepared the transfers thereof on some of them.

(7)  That she is informed and believes that Counts paid the first nine judgments at 10 per cent. of face value, and had same transferred to H. M. Graham; that said payment was a satisfaction of the judgments purchased, and they are no longer liens on the lands.

(8)  That the assignments are pretensive, null, and void, and made with intent to disturb her in the possession and enjoyment of her property.

(9)  That subsequent to the transfer of the first five judgments Graham had executions issued on them and lodged with the Sheriff, who attempted to levy on her lands described in the complaint, whereupon she instituted her action against him and her Sheriff for injunction, and a temporary injunction was granted.

(10)  That subsequently Graham and Counts secured a modification of the restoring order so that it applied only to judgments held by Graham.

(11)  That amongst those judgments was the one of C. H. Russell & Son, and she was informed and believes that the assignment of it was returned to Russell subsequent to the modification of the restoring order, and a pretensive assignment thereof to M. W. Dendy was secured, who caused execution on it to be issued and attempted to levy it on the land in order to disturb her in the possession thereof.

(12)  That the purchase or payment of said judgments by Counts is a satisfaction thereof, so far as she is concerned, and under the homestead proceedings referred to and acquiescence therein by the judgment creditors and the conveyance of the land to her by Counts, all his right,

title, interest, and estate, including his homestead therein, passed to and vested in her free from the liens of the judgments.

(13) That Counts'is and was head of family, and his homestead passed to her by the deed and the judgments constitute no lien on it, and it should be ascertained and set off to her, in event it should be decided that any of the judgments are liens on the land, and the mortgage indebtedness should be paid from the proceeds of the remaining portion of the land.

(14) That in event judgments are declared to be valid liens on the lands, and that Dendy and Graham are valid holders, then the amounts paid by them with interest is all they should be permitted to recover, and she should be declared to be the owner of any judgments paid from the proceeds of the sale of said land or any portion of it.

*Answer of Judgment Creditors:*

The judgment creditors, other than Nashville Saddlery Company, Parker Manufacturing Company, Montgomery-Moore Manufacturing Company, Hughes Buggy Company, Georgia Chemical Works, William H. Russell & Son, Franklin Buggy Company, and Navassa Guano Company, answered, setting up their judgments and claiming same to be liens on the land; that the conveyance of same to Mrs. Owings by Mr. Counts was for the use and benefit of Owings & Owings; that Counts was hopelessly insolvent at the time of the conveyance, and the conveyance was void as a preference of Owings & Owings over other creditors, and was void under the assignment law and under the Statute of Elizabeth; and Mrs. Owings and Owings & Owings should account for rents and profits. The Mitchell-Lewis Motor Company further answered that the assignment of its judgment to H. M. Graham was obtained by fraudulent representations, and was null and void, and that amount paid for said assignment by Counts had been credited on the

judgment, and the judgment was owned by it and was a lien on the land.

*Answer of D. H. Counts to the Answer of*
*Mrs. M. A. Owings:*

He denies that Mrs. Owings is the owner of the land; that executions were issued on all the judgments; that the valuation of $7,500 on the land by the appraisers was accepted by the parties, and that they are estopped from questioning same; that the mortgages amounted to more than the value of the property at the time of the appraisement, the allegations of paragraphs 7, 8, 11, and 12; that the judgments were pretensively assigned; that his homestead passed under his deed; that Graham and Dendy should be paid nothing in excess of the amounts paid by them for the judgments; and that the judgments paid for the property should be assigned to and become the property of Mrs. Owings.

Further answering, he alleges:

(1) That M. J. Owings and Mrs. M. A. Owings are now, and were since prior to 1914, partners in business.

(2) Set up contract with Owings & Owings and same defenses as set forth in fourth paragraph of further answer to complaint.

(3) That before said contract was entered into he is informed and believes that Owings & Owings secretly induced J. Q. Brown to withdraw from the firm of Counts & Brown, dissolve the partnership, and refuse to continue farming operations of Counts & Brown immediately after Counts had delivered to Owings & Owings the personal property and conveyed the Coleman tract of land.

(4) That, immediately after Counts delivered the personal property to Owings & Owings and conveyed the Coleman tract to them, Brown gave notice to him that he (Brown) had withdrawn from the firm of Counts & Brown,

that said firm was dissolved, and that he refused to continue the farming operations of Counts & Brown.

(5) That Owings & Owings knew before they signed the agreement that Brown was going to withdraw from and dissolve the partnership of Counts & Brown, and that they could not be required to perform their part of the agreement.

(6) That Owings & Owings by fraud and deception induced Counts to deliver to them the personal property and the deed and possession of the land.

(7) That the consideration inducing him to deliver the said property and execute said deed to Owings & Owings has failed, and they should be required to account for said property and to deliver up the deed for cancellation, and account for rents at $2,500 per year.

(8) That he is head of a family residing in this State and is entitled to a homestead.

(9) That a receiver should be appointed.

*Answer of H. M. Graham to the Answer of*
*Mrs. Owings:*

(1) Denies allegations of paragraphs 7, 8, 11, and 12 of the answer.

(2) That he purchased for value the judgments claimed by him in his answer to the complaint.

*Answer of H. M. Graham to the Answer of*
*Mitchell-Lewis Motor Company:*

Denies the allegations not admitted; admits paragraph 3 and that no part of the judgment has been paid, and that same is a lien on the lands; that he purchased the judgments claimed by him in his answer to the complaint, including the judgment of Mitchell-Lewis Motor Company.

*Decree:*

The two cases stated above were heard together. The facts may be briefly stated as follows:

In 1911 the defendant, D. H. Counts, was the owner of the plantation described in plaintiff's complaint, known as the Coleman place, containing 313 acres.

Mr. Counts was a member of the firm of Counts & Cowan, engaged in selling mules and horses. He was also a member of the firm of D. H. Counts & Son, engaged in selling buggies, wagons, etc. He was, however, chiefly engaged in farming on his said plantation, known as the Coleman place. He owned a house and lot in Laurens, where he and his family resided. His house and lot in Laurens were incumbered by mortgages to secure debts amounting practically to the value of the property. The Coleman tract of land was incumbered by a mortgage to the estate of William E. Lucas, deceased, for $5,000.

On January 5, 1911, D. H. Counts gave two notes to the Enterprise Bank of Laurens, S. C., one for $1,712.20, and one for $4,287.80—total amount, $6,000—both payable November 1, 1911, and on the same day he executed a second mortgage over the Coleman tract of land to the said Bank to secure the payment of the said notes.

In 1911 Mr. Counts failed in business. A large number of his creditors pressed for the payment of their claims and instituted bankruptcy proceedings. In the bankruptcy proceedings Mr. Counts claimed immunity from the Bankrupt Act on account of being chiefly engaged in farming. His contention was sustained by the Court, and the proceedings in bankruptcy dismissed.

Some of Mr. Counts, creditors in the spring of 1912, sued their claims to judgment, and later a number of others did likewise. In the Spring of the year 1914 some of the judgment creditors of D. H. Counts issued executions on their judgments and lodged same with the Sher-

iff of Laurens County. Mr. Counts claimed homestead. Appraisers were appointed, and on March 6, 1914, said appraisers filed their return, in which they valued the house and lot in Laurens at $9,500, and the Coleman tract of land at $7,500, and stated that the said house and lot and the tract of land could not be divided in kind without injury to the remainder. Nothing futher in reference to the homestead has been done. D. H. Counts, house and lot in Laurens was sold in 1915 under judgment of foreclosure, and it did not bring enough to pay the mortgage indebtedness.

On January 9, 1915, D. H. Counts conveyed the Coleman tract of land to Mrs. M. A. Owings in consideration of certain agreements of Owings & Owings, some of which were embraced in a written instrument signed by Owings & Owings on the said 9th day of January, 1915, and also in consideration of said agreements D. H. Counts delivered to Owings & Owings all of his personal property except such as had been assigned to his homestead.

In December, 1917, and in the first part of the year 1918, the defendant, H. M. Graham, procured, to be assigned to him, a number of the oldest judgments against D. H. Counts, paying much less than their face value for them. He issued executions on said judgments and lodged them with the sheriff. The sheriff levied on the Coleman tract of land and advertised it for sale, whereupon the plaintiff Mrs. M. A. Owings commenced the first action above stated and secured a temporary injunction against H. M. Graham and the sheriff.

Thereafter the defendant W. M. Dendy procured to be assigned the judgment of C. H. Russell & Son against D. H. Counts. Execution was issued thereon and lodged with the sheriff. The sheriff levied said execution on the Coleman tract of land and advertised it for sale. Whereupon the plaintiff M. J. Owings commenced the second action above stated for the foreclosure of the mortgages

given by Counts to the Lucas estate and to the Enterprise Bank. He alleged that the said mortgages had been assigned to him, and that he was the owner of them, and he secured a temporary injunction restraining the defendants from selling the said land under execution.

The defendant D. H. Counts in his answer alleges that in their answer that they are the owners of the judgments assigned to ' them, and ask that they be declared the owners of the said judgments, and that said judgments be paid from the proceeds arising from the sale of the said land, and that plaintiff's complaint for injunction be dismissed.

The defendant, S. C. Reid, sheriff, alleged in his answer to Mrs. M. A. Owings' complaint that he had neither knowledge nor information sufficient to form a belief as to the truth of the material allegations of said complaint.

The defendant D. H. Counts in his answer alleges that the plaintiff M. J. Owings and the defendant Mrs. M. A. Owings, doing business under the firm name of Owings & Owings, procured the deed to the Coleman place from him by misrepresentation and fraud and he asked that said deed be canceled for fraud and want of consideration, and that the defendant's homestead be set off to him in the said tract of land, and that the defendants Owings & Owings be required to account for all personal property delivered to them under said agreement, and that they be required to account for the rents and profits of said plantation.

In the first action stated above the plaintiff, Mrs. M. A. Owings, seeks to enjoin the defendants H. M. Graham and S. C. Reid, as sheriff, from selling the tract of land described in plaintiff's complaint under executions issued on judgments recovered by certain creditors of one D. H. Counts against him; said D. H. Counts being the owner of the said tract of land at the time the said judgments were recovered. The plaintiff alleged that the said judgments

had been paid by the said D. H. Counts, the judgment debtor, and that the assignment of the judgments to H. M. Graham was pretensive, etc., and that Graham was not the owner of the said judgments, etc. On hearing read plaintiff's complaint and a number of affidavits, his Honor, Judge S. W. G. Shipp, granted a temporary injunction restraining the defendants from selling said land under said executions.

It will be remembered that there are two cases before the Court at this time:

(1) A suit to enjoin H. M. Graham and Sheriff Reid from levying on and selling the Coleman place to satisfy a judgment against D. H. Counts alleged to belong to H. M. Graham by assignment thereof, and to remove cloud on title.

(2) A suit to enjoin all persons from proceeding in any way other than in the suit before us from enforcing their claims against D. H. Counts, and asking that the Coleman place be sold and the mortgages thereon alleged to belong to M. J. Owings by assignment be paid from the proceeds of the sale. A temporary order of injunction was made in each case.

It seems to me that the first action should be dismissed, or that the temporary injunction be not made permanent, for the reason that the relief sought in the first action can be obtained in the second action.

The second action asks for the same relief as does the first, but in addition it seeks to have the rights of all parties adjudicated. So no useful purpose can be subserved by continuing the first action and by granting a permanent injunction against H. M. Coleman and the sheriff. Our attention will therefore be confined hereafter to the issues raised by the pleadings in the second suit.

The plaintiff asks first, that all parties be confined to this for such relief as they may be entitled to in the premises, that the Coleman place be sold, and the proceeds of sale ap-

plied to the payment of the mortgages on it with accrued interest, and that the remainder be turned over to plaintiff.

The various answers filed raise the following questions:

Should the conveyance of the Coleman place be set aside as being in violation of the assignment law?

Should it be set aside as being fraudulent and void under the Statute of Elizabeth?

Should it be set aside on account of a failure or want of consideration?

Have the judgments that were assigned to H. M. Graham and Denby been satisfied so that they are longer liens upon the real estate of D. H. Counts, or are they liens owned by Graham and Denby by assignment to them respectively?

Should the rent of the Coleman place since the time plaintiff took charge of the premises under a deed from Counts be credited on the mortgages, and in what amount?

Should the homestead in real estate be allowed to Counts out of the Coleman place?

Should a receiver of the property of Counts be appointed?

These are questions I am called upon to answer in formulating a decree. There is before me a mass of testimony, much of it irrelevant to any issue in the case, from which I must reach my conclusions. There has been delay in getting the record to me, and it comes to me just before I must take up my work in another circuit. I am unwilling to delay the filing of the decree in the case, and yet the time available to me in which to write it is short. I shall not therefore go at length into the reasons moving me to my conclusions, nor into a restatement of the law, but shall content myself with a statement of what those conclusions are.

Should the deed in question be set aside? My conclusion is that it should be for the reason that it was void under the assignment law. It was a conveyance of all of

the property of Counts. It was made at a time when Counts was insolvent and creditors were clamoring for the payment of their claims. It was made and accepted for the purpose of giving Owings and Owings a preference over other creditors. It was tantamount to an assignment with preferences by Counts to Owings & Owings. It should therefore be set aside and cancelled of record.

The deed should be set aside for the further reason that the consideration upon which it was made was never forthcoming, and it would be inequitable and a fraud to allow it to stand. A written agreement sets forth the terms upon which the deed should be made. One of the conditions was that Owings & Owings should pay the mortgages on the land. This proceeding is for the purpose of foreclosing those very mortgages, an assignment of which was taken to one member of the firm of Owings & Owings, while the deed was made to another member of the firm to prevent, as it said, a merger of the two estates. See *Fretwell v. Branyon,* 67 S. C. 95, 45 S. E. 157.

The deed and the mortgages were held by and in the name of Mrs. M. A. Owings and M. J. Owings, respectively. But they were held in trust for Owings & Owings, they having negotiated the transaction and promised the consideration, which agreement, however, was not carried out by the firm.

Have the judgments that were assigned to H. M. Graham and M. W. Dendy, respectively, been paid, and are they the property of these men, respectively? These judgments have not been paid. They are the property of H. M. Graham and M. W. Dendy, respectively, by assignment of the judgments to them.

My conclusion is that the mortgages in question are the property of Owings & Owings, although for convenience, the assignment of them was to one member of the firm, who holds them as trustee for the firm of Owings & Owings. They are entitled to have them foreclosed on the

Coleman place, if any amount is due on them.    Being cred-
itors in possession of the mortgaged premises, the rent of
those premises should be applied to the extinguishment of
the mortgage debt after calculating interest on the debts
secured, and crediting the mortgage debt with rents of the
Coleman place since 1915, and, giving credit for the taxes
on the Coleman place paid by the plaintiff, to wit, $395.96,
Owings & Owings should receive the balance due on the
mortgage debt if there should be a balance.    According
to my calculation, the rents from the Coleman place are
more than enough to extinguish the mortgages and to re-
imburse Owings & Owings for the amount paid for taxes.

There was at the time of the commencement of this
action something due on the mortgages, which amount,
however, has been almost, if not entirely, paid by the appli-
cation of the rents subsequently received.    This fact is
important in determining whether or not a fee should be
allowed plaintiff's attorneys for foreclosing the mortgage.
Certainly they would not be allowed a fee for coming into
Court with a mortgage for which nothing was due.    But
if there was anything due on the mortgages which contain
provisions that a fee should be allowed to attorneys should
it become necessary to foreclose, the case is different.    So
we will first ascertain if any amount was due on the mort-
gages at the commencement of this action.    According to
my calculation, the matter stands as follows:

Rents to be applied to the mortgages:

| | |
|---|---:|
| Nov., 1915, 1,200 lbs. cotton at 11¼c | $1,350.00 |
| Less taxes paid | 43.50 |
| | $1,306.50 |
| Nov., 1916, 12,000 lbs. cotton at 18¼c | $2,190.00 |
| Less taxes | 18.10 |
| | $2,170.90 |

28 S. C.—120.

Circuit Decree

| | |
|---|---:|
| Nov., 1917, 12,000 lbs. at 28c ............................... | $3,360.00 |
| Less taxes ......................................................... | 60.53 |
| | $3,299.47 |
| Nov., 1918, 12,000 lbs. at 30c ............................... | $3,600.00 |
| Less taxes ......................................................... | 67.00 |
| | $3,533.00 |
| Nov., 1919, 12,000 lbs. at 37c ............................... | $4,440.00 |
| Less taxes ......................................................... | 80.51 |
| | $4,359.49 |
| Less 1920 taxes ................................................. | 96.05 |
| | $4,263.44 |

There was due on the Enterprise Bank mortgage:

| | |
|---|---:|
| Nov. 5th, 1912 ..................................$ | 5,509.81 |
| | .08 |
| | 44,078.43 |
| | 3 years |
| | 1,322.35 |
| Nov. 5th, 1916 ................................... | 5,509.81 |
| | 6,832.16 |
| Less rent ............................................. | 1,306.50 |
| Nov. 5th, 1915 ................................... | 5,525.66 |
| | .08 |
| | 44,205.28 |
| | 552,566.00 |

Nov. 5th, 1916 ........................................ 5,967.71
Less rent 1916 ...................................... 2,170.90

Nov. 5th, 1916 ...................................... 3,797.81
                                                          .08

                                                    30,376.68
                                                   379,781.00

Nov. 5th, 1917 ...................................... 408,357
Less rent 1917 ................................... 3,299.47.00

Nov. 5th, 1917 ...................................... 784.10
Nov. 5th, 1917 ...................................... 784.00
                                                          .08

                                                    627,280
                                                    784.10

                                                    846.82
Less rent, 1918 ...................................... 3,555.00

Overpaid and cancelled Nov. 5th, 1918   2,688.18

   The amount due on the Lucas mortgage:
Nov. 5, 1918 ...................................... $   6,802.44
Less rent overpaid .............................   2,686.18

                                                   4,116.26
                                                        .08
                                                  32,930.08
                                                 411,626.00

                                                   4,445.56
Less rent 1919 ...................................... 4,359.49

| | Circuit Decree | [120 S. C. |
|---|---|---|
| Nov., 1919 ........................................... | 86.07 | |
| | .08 | |
| | 688.56 | |
| | 8,607.00 | |

Amount due on Lucas mortgage:
Nov. 15, 1920 ............................... 92.95

It will be seen at the time this action was brought there was due on the mortgages after applying the rents received up to that time and after allowing the plaintiff to be reimbursed for taxes already paid the sum of $4,116.26. This amount was subsequently reduced by the application of rents till nothing more will remain due thereon on the 15th of November, 1920, than $92.95. The 1920 taxes should be paid by the plaintiff. The rents for 1920 have not been applied to the mortgage, and the value of it is not yet known, although the amount of cotton, to wit, 12,000. pounds, is known.

The value of this rent, less the balance due on the mortgage, to wit, $92.95, should be paid into Court to the Clerk of this Court by the plaintiff M. J. Owings, trustee for Owings & Owings.

The defendant D. H. Counts is the head of a family residing in this State, and is entitled to have a homestead in real estate assigned to him.

The plaintiff's attorneys should be allowed a fee of $500.

The real estate known as the Coleman place should be sold at public auction at some convenient sales day by the Clerk of this Court. From the proceeds of sale and the amount hereinabove ordered to be turned into Court by the plaintiff as trustee for Owings & Owings, the cost of this action, including a fee of $500 to plaintiff's attorneys, should be paid. One thousand dollars should then be assigned to D. H. Counts as his homestead in real estate.

So much of what remains should be applied to the payment of judgment liens according to their several priorities. It is specifically decreed that the judgments transferred to H. M. Graham and M. W. Dendy have not been paid, but are theirs respectively by assignment.

The balance remaining after paying the judgments against D. H. Counts, according to their several priorities, should be turned over to D. H. Counts.

Any of the parties hereto are given leave to apply for any further order to carry this decree into effect.

The temporary injunction heretofore made in this case should be made permanent, except as to the enforcement of any chattel mortgages that may be held by any of the parties hereto. No adjudication is made as to any chattel mortgages and seizure of property covered by such will not be in violation of this order.

It is so ordered, adjudged, and decreed.

*Messrs. Simpson, Cooper & Babb,* for M. J. Owings and Mrs. M. A. Owings, appellants, cite: *Assignees of judgments for the benefit of debtor cannot set them up against purchaser from debtor:* 14 A. & E. Enc. L. (2nd Ed.) 282; 26 N. J. Eq. 144; 1 Hill Eq. 113; 2 McC. 152. *Conveyance from debtor to creditor good unless it gave unlawful preference:* 26 S. E. 249; 44 S. C. 183. *Good against grantor in any event:* 14 A. & E. Enc. L. (2nd Ed.) 223, 225. *Inquiry should be as to bona fides of debt, sufficiency of consideration and reservation of benefit to debtor:* 14 A. & E. Enc. L. (2nd Ed.) 226; 52 S. C. 130; 52 S. C. 472. *Not void as against creditors not injured by its execution:* 14 A. & E. Enc. L. (2nd Ed.) 255; note 2. *Conveyed no property that could have been reached by creditors at time of conveyance:* 2 A. & E. Enc. L. 256; 44 S. C. 299; 26 S. C. 1; 24 S. C. 428. *Intent to defraud must have existed at time of conveyance, and grantee have had knowledge of fraudulent design:* 14 A. & E. Enc. L. (2nd Ed.) 269-70;

2 Hill Eq. 27; 4 S. C. 249; 41 S. C. 463. . *Good as to parties, if void as to creditors*: 14 A. & E. Enc. L. (2nd Ed.) 273; 2 Hill L. 488; 1 N. & McC. 334; 4 Rich. L. 491; Riley L. 219; 2 Rich. Eq. 104. *Equity will protect grantee to extent of consideration*: 1 Hill Eq. 288; 2 Hill Eq. 95, 14; A. & E. Enc. L. (2nd Ed.), 346. *Judgment creditors estopped by laches*: ·98 S. C. 410; 14 A. & E. Enc. L. (2nd Ed.), 353. *Liability for rents under fraudulent deed*: Ann. Cas. 1914A. 998; 47 S. C. 556; 49 S. E. 131.

*Messrs. Richey & Richey, Blease & Blease* and *Featherstone & Knight,* for D. H. Counts, H. M. Graham, M. W. Dendy and S. C. Reid, Sheriff, respondents, cite: *Equity will not allow security to be kept alive to perpetrate a fraud*: 2 Pom. Eq. Jur. (2nd Ed.), 794. *Attorney's fees*: 105 S. C. 204. *Fraudulent conveyances*: 109 S. C. 283. *Accounting by mortgagee in possession*: Eaton Equity 466. *Wide range when fraud is charged:* 103 S. C. 405. *Principal liable for fraudulent act of agent in course of agency:* 13 S. C. 5. *Fraud*: 85 Conn. 77; 26 A. & E. Ann. Cas. 388. *Suppression of facts may be the same as a direct falsehood*: 92 S. C. 393; 111 S. C. 41. *"He who comes into Equity must come with clean hands"*: 4 A. L. R. 46; 188 Ala. 640; . 64 Conn. 154. *Accounting for rents:* 47 S. C. 576; 47 S. C. 75. *Attorneys for mortgagee under fraudulent mortgage not entitled to fees*: Jones Morts. Sec. 863, 864; 99 A. L. R. 145. *Merger:* 67 S. C. 95; 140 A. L. R. 758; 31 S. C. 404.

 *Messrs. Dial & Todd,* for certain judgment creditors, appellants and respondents, cite: ·*Conveyance void under assignment act:*·54 S. C. 354; 55 S. C. 303; 46 S. C. 157; 22 S. C. 111; 42 S. C. 482; 37 S. C. 237. *Grantor and grantee parties to fraud*: 64 S. C. 354; 92 S. C. 393; 94 S. C. 84; 96 S. C. 70. *Merger*: 2 Pom. Eq. Jur. (Ed. 1882), Sec. 797, 254; 67 S. C. 95.

July 6, 1922.

The opinion of the Court was delivered by Mr. Justice Cothran:

These two actions were tried together. The first is an action to enjoin the enforcement of certain executions issued upon judgments recovered against D. H. Counts and levied upon certain real estate conveyed by Counts to Mrs. M. A. Owings. The second is an action to foreclose certain mortgages executed by Counts and claimed by M. J. Owings as assignee.

The cases were referred to a special referee to take the testimony, and were heard by his Honor, Judge Frank B. Gary, who filed a decree dismissing the first action and finding against the plaintiff in the second action. From his decree practically all of the parties appeal.

The cases are exceedingly complicated, and it will be necessary to cover the facts in an extended statement:

In the year 1909 D. H. Counts was the owner of a tract of land near the city of Laurens containing some 313 acres. He was a dealer in stock and vehicles and a farmer upon quite a large scale, running two farms, the Coleman place above described and another known as the Shaw place.

Owings & Owings was a mercantile firm doing business in Laurens, composed of M. J. Owings and his aunt, Mrs. M. A. Owings, he having practically the sole management of the business, and she but slightly informed of its details.

Counts and the laborers on his farms, for whose accounts he was responsible, were being furnished supplies by Owings & Owings, the arrangement running over a number of years, continuously from 1909 through the year 1914; Owings & Owings each year taking chattel mortgages for the advances made and to be made. Counts and a man named Brown were also in 1914 running a farm as partners in Chesterfield County. At the end of 1914 the books of Owings & Owings showed a balance due by Counts of $13,-

137.83 and by Counts & Brown of $7,033.79, a total of more than $20,000.

Prior to the year 1914 Counts had executed two mortgages upon the Colemen place:

(1) The Lucas mortgage: This mortgage was a first lien upon the Coleman place. It was given by Counts to secure a note to the estate of W. E. Lucas, deceased, dated November 15, 1909, for $5,000, payable November 15, 1914, with interest from date at 8 per cent. per annum, payable annually, and 10 per cent. attorney's fees. The interest upon the note was paid by Counts up to November 15, 1914, after which he paid nothing. On November 1, 1917, the executors of Lucas assigned the note and mortgage to M. J. Owings he having paid the amount due thereon at that date.

(2) The Enterprise Bank mortgage: This mortgage was a second lien upon the Coleman place. It was given by Counts to secure two notes, one for $1,712.20, dated January, 5, 1911, due November 1, 1911, with interest after maturity at 8 per cent. per annum and 10 per cent. attorney's fees, and the other for $4,287.80, the date, maturity, and interest same as other note. The two notes aggregated $6,000. On November 1, 1912, the amount due on the first note was $1,712.20, and on the other $3,787.80, total, $5,500.00. On November 5, 1912, both notes and the mortgage were assigned by the bank to M. J. Owings.

In 1912, 1913, and 1914 the following judgments were entered against Counts:

1912.

(1) May. Nashville Saddlery Co. .............................$ 1,131.64
(2) Apr. Parker Mfg. Co. ......................................... 286.15
(3) Aug. Montgomery-Moore Co. ........................... 91.23
(4) Sept. Hughes Buggy Co. .................................... 510.00

1913.
  (5)  May.  Lummus Gin Co. ............................... 1,616.10
  (6)  Oct.  Georgia Chemical Co. ........................... 354.35
1914.
  (7)  Mar. Mitchell-Lewis  Co. ............................ 1,447.47
  (8)        C. H. Russell & Son ............:............... 2,412.82
  (9)        Franklin Buggy Co. ............................. 319.46
 (10)        Navassa Guano Co. ............................. 1,777.03
 (11)  May. B. T. Crump Co. ............................... 188.37
 (12)        Shadburn Bros. ................................. 480.00
 (13)        Brand Shoe Co. ................................. 456.30
 (14)        A. A. Chemical Co. ............................. 6,881.21
 (15)        A. Wrenn & Sons ............................... 405.50
 (16)        F. A. Ames Co. ................................. 1,572.51
 (17)        Ratterman & Luth .............................. 1,256.65
 (18)        American Carriage Co. ......................... 578.80
 (19)        James & Mayer Co. ............................. 372.28
                                                      _____

       Total (exclusive of costs) ...................$21,137.77

In March, 1914, the judgment creditors numbered 1, 2, 3, and 4, above, had issued executions upon their judgments and lodged them with the sheriff. Counts claimed homestead. The appraisers appraised the Coleman place at $7,500, and a house and lot in Laurens at $9,500. No exceptions were filed to the return and no further steps at that time were taken to enforce the executions, presumably for the reason that the mortgages exceeded the appraised value of the property. The house and lot were sold in 1915, but did not bring enough to pay the mortgage debt.

It appears that in the Fall of 1914 Counts was "down and out" financially. He surrendered his lease of the Shaw place and leased the Coleman place to one C. W. Long, with the intention of discontinuing farming operations in Laurens County.

On January 9, 1915, Counts and Owings & Owings entered into a written agreement prepared and advised by Counts' attorneys, Messrs. Richey & Richey, reputable members of the Laurens bar. This agreement, after reciting the fact that Counts, Counts & Brown, and Brown were considerably indebted to Owings & Owings for advances, secured by a mortgage of personalty and crops, and that Counts & Brown desired to continue farming operations in Chesterfield County and desired Owings & Owings to carry over until the Fall of 1915 a part of said indebtedness and to furnish them with a certain quantity of corn, fodder, cotton seed, and fertilizers to enable them to make the crop of 1915, contained the following stipulations:

(1) That, if they continued farming operations in 1915, Counts & Brown should keep 2,000 bushels of corn and 15,000 bundles of fodder then on the plantation raised in 1914 and covered by mortgage to Owings & Owings, and that Owings & Owings should furnish Counts & Brown 50 tons of fertilizers and allow them to keep the mules and farming implements also covered by mortgage to Owings & Owings to make the crop of 1915.

(2) That Counts & Brown should immediately deliver to Owings & Owings all crops then on the plantation, except the corn and fodder above named, to be credited at the market price on the indebtedness referred to.

(3) That Counts & Brown should give to Owings & Owings a first mortgage on all crops of 1915, and also all mules, farming implements, and lease then covered by mortgages to Owings & Owings as security for the aforesaid indebtedness and the 50 tons of fertilizers.

(4) That D. H. Counts should turn over to Owings & Owings all personal property over which they then had a mortgage, including a lot of cotton seed then at the Coleman place and to Farmers' Bank the mules over which it had a mortgage.

(5) That D. H. Counts should convey to Mrs. M. A. Owings his interest in the Coleman place, together with the cotton gins, press, engine, and boiler and all cotton machinery then on the Coleman place and give immediate possession of the Coleman place to Mrs. M. A. Owings.

This instrument was executed in duplicate, dated January 9, 1915, signed "Owings & Owings, by M. J. Owings," and witnessed by R. E. Babb and W. R. Richey, both attorneys of the Laurens bar, Mr. Richey being the attorney of Counts.

Accordingly, at the time that the agreement was consummated by execution, Counts executed a deed conveying the Coleman place to Mrs. M. A. Owings, in consideration of $5. The general warranty contained this exception:

"Except as against the mortgage given to E. R. Lucas et al., trustees, for $5,000.00, and the mortgage given to the Enterprise Bank for $6,000.00, on which a part has been paid."

It is dated January 9, 1915, probated before W. R. Richey, notary public, dower renounced January 13, 1915, and recorded January 23, 1915. M. J. Owings testified:

"The understanding with reference to the mortgages was that I was to take up the mortgages on the land."

Mrs. M. A. Owings states in her answer:

"That she assumed the payment of the mortgages as a part of the consideration for the purchase of the land."

The Coleman place then being under lease to Long under contract with Counts, possession could not be delivered to Mrs. M. A. Owings, but it seems that Long attorned to her, and that she (or M. J. Owings for her) collected the rents during the following years, in the amounts stated:

1915—$1,350.00, less taxes $43.50 ................$1,306.50
1916— 2,190.00, less taxes   18.10 ................ 2,171.90
1917— 3,360.00, less taxes   60.53 ................ 3,299.47

1918— 3,600.00, less taxes    67.00 .................. 3,533.00
1919— 4,440.00, less taxes    80.51 .................. 4,359.49

$14,940.00              $269.64              $14,670.36

A disagreement ensued early in January, 1915, between Counts and Brown with reference to certain money claimed by Brown to be due to him by Counts, and Brown refused to continue the farming operations with Counts in Chesterfield County, and consequently Owings & Owings did not comply with their stipulations to furnish certain advances to the firm of Counts & Brown, the agreement to do so being dependent upon their continuing farming operations for the year 1915.

In September, 1915, Counts left Laurens and went to Florence, where he resided until he returned to Laurens in September, 1917, for the purpose of re-entering into business. He then conceived the idea of buying up the oldest of the judgments against himself, and first suggested it to his friend and kinsman, the defendant H. M. Graham. Both testify that it was to be done solely for the benefit of Graham, he taking over the claims and holding Counts for nothing, intending to give him no benefit in the transactions. Immediately Counts began to take up with the various judgment creditors the acquisition of the judgments. The negotiations, which will be considered in detail later, resulted in the assignments of the following judgments to Graham and the defendant, M. W. Dendy.

The following statement shows the judgments claimed to have been assigned to H. M. Graham with the amounts paid therefor by him:

No. 1. Nashville Saddlery Company    $1,131.64    $114.00
No. 2. Parker Mfg. Company .........    286.15    75.00
No. 3. Montgomery-Moore Company    · 91.23    20.00
No. 4. Hughes Buggy Company ....    518.00    98.90
No. 6. Georgia Chemical Company    354.35    35.00

No. 7. Mitchell-Lewis Company ...... 1,447.47 185.24
No. 9. Franklin Buggy Company .... 319.46 50.00
No. 10. Navassa Guano Company 1,777.03 178.19

$5,925.33 $756.33

And the same to M. W. Dendy:
No. 8. C. H. Russell & Son ............ $2,412.82 241.77

On March 5, 1918, H. M. Graham, claiming to be the owner and assignee of the judgments numbered 1, 2, 3, 4, and 6, lodged executions with the sheriff and caused the same to be levied upon the Coleman tract of land, which, as before stated, had been conveyed by Counts to Mrs. M. A. Owings pursuant to the agreement of January 9, 1915. The land was advertised for sale by the sheriff. Thereupon Mrs. M. A. Owings commenced the action first stated in the title hereof against Graham and the sheriff for the purpose of enjoining the sale, alleging that the judgments had in fact been paid off by Counts, and that the assignments to Graham were pretensive. Upon the complaint in this action Judge Shipp granted an injunction *pendente lite*. Thereafter the defendant M. W. Dendy, claiming to be the owner of the judgment numbered 8 above, lodged an execution with the sheriff and caused the same to be levied upon the Coleman place and had the same advertised for sale in June, 1918. Thereupon M. J. Owings, claiming to be the assignee of the Lucas and Enterprise Bank mortgages, commenced the other action stated in the title hereof against Mrs. M. A. Owings, D. H. Counts, H. M. Graham, and the judgment creditors of D. H. Counts for foreclosure of said mortgages and for injunction against the sale. Upon this complaint Judge Sease granted an injunction *pendente lite*. Let the complaint and the answers, be reported, with the Circuit decree.

The questions apparently arising upon the exceptions and discussed in the arguments will be taken up in what appears to us their logical order.

Does the grantee, Mrs. M. A. Owings, in the conveyance from D. H. Counts of the Coleman place, really hold the title for the firm of Owings & Owings? The agreement from which the conveyance resulted was negotiated by M. J. Owings, the active partner in the firm. The consideration was furnished by the partnership. The obligations assumed were those of the partnership. As D. H. Counts in his answer alleges: "The deed to the mortgaged premises was made to Mrs. M. A Owings and the mortgages were assigned to M. J. Owings for the purpose of preventing the mortgages from being merged into the title," an allegation which is sustained by the evidence. We conclude, therefore, that the title is in Mrs. M. A. Owings as a trustee for the partnership.

Does the assignee, M. J. Owings, in the assignment of the Enterprise Bank mortgage, really hold the title for the firm of Owings & Owings? This assignment was executed on November 5, 1912, more than two years prior to the execution of the agreement of January 9, 1915. There is no evidence tending to show that this was other than an individual transaction. The debt was secured by two notes, one for $1,712.20 and the other for $4,287.80, total, $6,000.00. Treating the two notes as one note for $6,000.00, the obligation was dated January 5, 1911, due November 1, 1911. It was not paid at maturity, and was allowed to run on until July 12, 1912; various small credits having been entered in the meantime. The balance due on July 1, 1912, was $5,211.15; that is, $6,000 less the intermediate credits of $788.85. On July 12, 1912, a new note was given by Counts for $5,509.80, due November 1, 1912, which represented the balance of the $6,000 unpaid, $5,211.15, and the interest charged to November 4, 1912. A few days after the maturity of this new note for $5,509.80, Owings made a settlement of it with the bank by paying $2,000 cash and giving his note for the balance ($3,509.80 plus $97 discount), $3,606.80, pay-

able March 4, 1913. Thereupon the bank assigned the
notes and mortgage to M. J. Owings. The note for $3,-
606.80 due March 4, 1913, was paid by a cashier's check
given by Palmetto Bank to Enterprise Bank, the proceeds
of a loan made at that time by Palmetto Bank to Counts
and Owings. This loan was evidenced by three notes
signed by Counts, payable to and indorsed by Owings, each
dated March 10, 1913, (1) $1,200, due November 15, 1913,
(2) $1,200, due December 1, 1913, (3) $1,412, due De-
cember 15, 1913, total, $3,842, less discount $230.40,
$3,611.60, which was sufficient to pay off the Enterprise
Bank not of $3,606.80 plus the interest $4.70, the note being
overdue six days. None of these notes were paid at their
maturities, and on January 16, 1915, M. J. Owings made
a note to the Palmetto Bank for $3,842 and paid the in-
terest, $298.85. As the cashier testified, "Mr. Owings
gave his personal note and Mr. Counts dropped out," which
he afterwards paid.

3. Does the assignee, M. J. Owings, in the assign-
ment of the Lucas mortgage, really hold the title—
for the firm of Owings & Owings? This assign-
ment was executed on November 1, 1917, nearly three
years after the execution of the agreement of January 9,
1915. D. M. Counts alleges and testifies that the assump-
tion of this mortgage was a part of the consideration of the
conveyance. Mrs. M. A. Owings so alleges in her an-
swer, and M. J. Owings so testifies. The conclusion that
this was virtually an assignment to Owings & Owings fol-
lows naturally from these facts and from the conclusion
above that Mrs. M. A. Owings holds the title to the land
for the partnership.

4. If M. J. Owings, assignee of the Enterprise Bank
mortgage, really holds the title for the firm of Owings &
Owings, and Mrs. M. A. Owings, the grantee in the con-
veyance, holds the title to the land for said firm, does the
doctrine of merger apply, extinguishing the Enterprise

Bank mortgage? Our conclusion that M. J. Owings holds the assignment of this mortgage individually precludes the necessity for any further discussion of this question.

5. If M. J. Owings, assignee of the Lucas mortgage, really holds the title for the firm of Owings & Owings, and Mrs. M. A. Owings, the grantee in the conveyance, holds the title to the land for said firm does the doctrine of merger apply, extinguishing the Lucas mortgage?

The judgment of this Court in the case of *McCreary v. Coggeshall,* 74 S. C. 42, 53 S. E. 978, 7 L. R. A. (N. S.) 433, 7 Ann. Cas. 693, sustained by the masterful opinion of Mr. Justice Woods, now United States Circuit Judge, renders an extended discussion of this question unnecessary. The principle there announced, reaffirmed in *Gainey v. Anderson,* 87 S. C. 47, 68 S. E. 888, 31 L. R. A. (N. S.) 323, is that merger will not take place if opposed to the intention of the parties, affirmatively proved, or to be implied from the fact that merger would be opposed to the interest of the person in whom different estates or interests became invested. This is in harmony with text-writers and decisions everywhere.

"There is generally an advantage to the mortgagee in preserving his mortgage title; and where there is, no merger takes place. It is a general rule, therefore, that the mortgagee's acquisition of the equity of redemption does not merge his legal estate as mortgagee so as to prevent his setting up his mortgage to defeat an intermediate title, such as a second mortgage or a subsequent lien, unless such appears to have been the intention of the parties and justice requires it; and such intention will not be presumed where the mortgagee's interest requires that the mortgage should remain in force." 1 Jones, Mtg. (6th Ed.) § 870.

"It may therefore be deduced from the authorities as a general rule that, when the mortgagee acquires the equity

of redemption, in whatever way, and whatever he does with his mortgage, he will be regarded as holding the legal and equitable titles separately, if his interest requires this severance. The law presumes the intention to be in accordance with his real interest, whatever he may at the time have seemed to intend." 1 Jones, Mtg. (6th Ed.), p. 917.

The direct evidence is ample that a merger was not intended, and the implication is to the same effect from the apparent interest of the parties that there should be no merger. A strong reason for sustaining this position is the absence of any inequity to the judgment creditors whose condition would not be injuriously affected thereby.

6. Is the Enterprise Bank mortgage subject to a credit of $2,000 claimed to have been paid thereon by D. H. Counts? The defendant Counts and the judgment creditors contend that a part ( $2,000) of the payment made by Owings to the Bank in November, 1912, was of funds belonging to Counts, and for that reason it should be charged up to Owings, reducing the balance due thereon *pro tanto*.

The testimony as to who actually supplied the $2,000.00 which was paid to the Enterprise Bank is inconclusive. Counts swears that Owings paid it out of money to his credit on the store account. Owings swears that he paid it out of his own funds. The note bears a memorandum that the payment was made by Owings. The cashier swears that Owings personally made the payment. Counts has no receipt or other written evidence to sustain his statement, and the reason he gave for the payment by Owings out of his (Count's) money, that the mortgage should not show upon its face that it had been reduced, indicates a purpose to deceive some one and to gain a benefit to himself thereby, and does not commend it at all to a support of his contention. The action of the Circuit Judge in al-

lowing interest upon the mortgage balance from November 5, 1912, is at the least a failure to sustain the contention of Counts. The ledger account of Owings & Owings does not show a charge against Counts of $2,000 at that time, which would naturally have appeared if Owings had paid this sum for Counts out of money then in his (Owings') hands.

In view of the admitted fact that Owings personally made the payment, that the bank books and the memoranda on the notes show that Owings paid it, the burden was upon Counts to overcome this presumption, which he has hardly sustained by the explanation disclosing a questionable purpose.

Counts is evidently mistaken in his statement that he paid the first discount on the three notes given to Palmetto Bank to raise the $3,611.60 balance due the Enterprise Bank, for the books of the Palmetto Bank show that the amount of these notes was $3,842, from which was deducted the discount, $234.40, and the balance, $3,611.60, paid by cashier's check to the Enterprise Bank.

7. Was the agreement of January 9, 1915, tantamount to a preferential assignment under the assignment law and void? It is contended also by Counts and the judgment creditors that the transaction whereby Counts conveyed the Coleman place to Mrs. M. A. Owings and all of his property to Owings & Owings amounted to an illegal preference under the assignment law and is void.

Counts, in his answer, makes no such contention. He certainly could not be heard, at any rate, to attack the validity of his own deed upon his own alleged complicity in an unlawful act. If it be void or voidable, the invalidity must be urged by the creditors of Counts, not by him. As to the creditors, it appears that they are, without exception, judgment creditors, with liens antedating the conveyance, which of course did not displace those liens. If the prior mortgages are valid, the judg-

ments are liens still, but in subordination to them; if they are invalid, the judgment liens rank first. It is a matter of no possible moment therefore to the judgment creditors to attempt to declare the conveyance void under the assignment law.

So far as the personal property is concerned, it appears that it was covered to the extent of more than its value by chattel mortgages held by Owings & Owings, and that there was nothing in it for the creditors. The exceptions raising the question of error in the Circuit Judge's holding that the agreement of January 9, 1915, consummated by the deeds to the Coleman place and the transfers of personal property, was void under the assignment law, are sustained.

In 14 A. & E. 255, it is declared:

"The third requisite of a fraudulent conveyance is that the subject-matter of it should be something out of which the creditor could otherwise have realized all or a portion of his claim. The law takes no cognizance of fraudulent practices that injure no one, and so, no matter how covinous the intent, unless the thing upon which it operates be something which the law would appropriate to the payment of the debt, the conveyance cannot be fraudulent. A deed cannot be fraudulent against creditors who are not injured by its execution and who would not be benefited if it were declared void."

In a note it is said:

"Unless a creditor is placed in a worse position by a conveyance than he would otherwise have been he cannot successfully complain of it (*Howell Bros. Shoe Co. v. Mars*, 82 Tex. 493, 17 S. W. 370)"—in our opinion a reasonable and correct conclusion.

9. Was the agreement of January 9, 1915, obtained by fraudulent misrepresentations, and therefore void? The basis of this attack is that there was a connivance between Owings and Brown that Brown should

terminate the partnership in the Chesterfield farming oper-
ations, and that under the terms of the agreement relieve
Owings from a large part of the obligations assumed by
him thereunder. The facts do not justify this conclusion.
Counts had his remedy against Brown if he acted unjusti-
fiably in discontinuing the operations. He made no effort
to do so or complain and made no demand upon Owings,
but appears to have willingly acquiesced in the discontinu-
ance. Counts testified that he received a letter from Brown
to the effect that the partnership was dissolved; that he then
went to Chesterfield to see Brown, but could not induce him
to change his determination. He made no further at-
tempt against either Brown or Owings and appears to have
lapsed into a state of satisfaction that Owings was to re-
lieve him of all his farming indebtedness. We find no
evidence sufficient, hardly tending, to sustain the conten-
tion of Counts and certain judgment creditors in this re-
spect.

10. Was the agreement of January 9, 1915, avoided
by a breach of its conditions, invalidating the con-
veyance from D. H. Counts to Mrs. M. A. Owings?
In the first place, the obligation on the part of Owings &
Owings to furnish certain supplies to Counts & Brown was
expressly conditioned upon their continuing farming oper-
ations in Chesterfield. They did not do so, and this re-
lieved the obligation unless Owings by connivance with
Brown induced his breach of the agreement, of which there
is not sufficient evidence. But, even if Owings had
breached his contract with Counts, he had his remedy at
law. It was not a ground for annulling the conveyance.

11. Are H. M. Graham and M. W. Dendy bona fide
assignees of the judgments assigned to them and entitled
to a lien for the full amounts of the same? The transac-
tions resulting in the acquisition by Graham and Dendy
of certain judgments are explained in detail as follows:

(1) Judgment of Nashville Saddery Company, May

3, 1912, $1,131.64: The manager of the company testified, "D. H. Counts requested the transfer of our judgment;" that it was to be made in blank. On November 17, 1917, Counts wrote to the company:

"I must remove the judgments against me and have made arrangements to borrow enough money to pay you 10 per cent. of the amount of your claim and renew the balance by note. * * * Should I get six of these judgments, I can buy all the goods I need in my line and thereby be on my feet again."

On December 5, 1917, Counts writes to the company:

"I am inclosing check for $114.00 [which was 10 per cent. of the judgment] as per our agreement and note for balance of the judgment. The reason I did not send check by return mail was that I was trying to settle some of the other judgments against me which I hope to complete the next few days. * * * Please transfer the judgment in blank, as I am getting another party to make these payments for me."

Accordingly the judgment was returned to Counts, assigned in blank, and so continued until after March 18, 1918, at which time (soon after Graham had endeavored to enforce collection of the execution and the injunction suit had been commenced on March 15, 1918) his attorneys returned the assignment to the company, notifying them that they had inserted the name of Graham in the blank asking that it be witnessed.

(2) Judgment of Parker Manufacturing Company, April 27, 1912, $286.15: The manager of the company testified that D. H. Counts requested a compromise of their judgment; that the assignment came from Counts and was returned to him after execution; that they received $75 for the assignment by check of Counts & Wolf, a firm of which D. H. Counts was a member; that the check came by mail directly from Counts; that the assignment was made upon the representations of Counts that he was total-

ly insolvent and that a friend was putting up the money for him so that he could go in business again in his own name. On December 21, 1917, Counts wrote the company:

"I am trying to get back on my feet again to get control of the judgments against me in order that I may do business in my name. * * * The Nashville Saddlery Company at Nashville, Tenn., held the oldest judgment (No. 1 in the above list), which I bought at 10 cents on the dollar, and gave them my note for balance, which I am to pay from time to time as I can. Won't you be kind enough to do the same thing for me?"

On December 24, 1917, the company replied, asking what Counts would be willing to pay in full settlement of the judgment. On December 26, 1917, Counts replied, saying:

"But for the kindness of a friend, I could make no offer at all; but, if you prefer to make a final settlement, I will give you 15 cents on the dollar for your judgment. This is the best I can do, and I am doing it on borrowed money. * * * I am going to settle or quit trying."

On December 29, 1917, the company replied:

"We would like to settle same with you, so as to put you on your feet again if possible, and will say, if you will give us $75.00 cash, we will credit you in full and have the judgment cancelled."

On December 31, 1917, Counts inclosed check to them for $75 with a transfer of the judgment saying:

"I am having to transfer these judgments to a friend of mine, as I have absolutely no property or money."

The name of Graham was inserted upon return of the assignment to Counts.

(3) Judgment of Montgomery-Moore Company, August ——, 1912, $91.23: Negotiations for the purchase of this judgment were opened by Richey & Richey. They stated that the Nashville Saddlery Company (No 1.) had accepted a similar proposition and offered the company $20,

which they accepted and executed an assignment, as per direction of the attorneys named, to Graham on January 7, 1918. The name of the assignee was left blank, and the assignment was sent to D. H. Counts, who was to insert the name of the proposed assignee.

(4) Judgment of Hughes Buggy Company, September 20, 1912, $510: It was in the hands of a Greenville lawyer. In January, 1918, he received an offer from D. H. Counts to settle the judgment on a basis of 10 per cent. He replied on January 26, 1918, that the amount then due on the judgment was $738, and that his clients would accept $73.80 in full settlement and mark the judgment satisfied if in addition Counts would pay the costs and attorney's fee of $25. On February 1, 1918, Counts forwarded to the attorney check for $98.90 "in full payment of judgment" and fee which the attorney acknowledged on February 2, 1918, stating that he had forwarded assignment to his clients for execution. The assignment was executed in blank, returned to Counts, and the name of Graham was inserted.

(5) Judgment of Lummus Gin Company, May ——, 1913, $1,616.10: This judgment was not assigned to either Graham or Dendy. It was taken up by M. J. Owings and assigned to him. In the settlement of January 9, 1915, between Counts and Owings this debt was canceled.

(6) Judgment of Georgia Chemical Company, October 25, 1913, $354.35: The company received a letter from Counts stating that he had no property, but was willing to pay $35.00 for the judgment. The letter was forwarded to H. S. Blackwell, Esq., attorney for the company, with instructions to act. Counts wrote on December 29, 1917, requesting that the judgment be assigned. The assignment was forwarded to the company by Richey & Richey. The money was paid to the salesman on January 4, 1918, and the assignment to Graham was executed and dated January 14, 1918. The secretary of the company testified

that the company were under the impression, when the settlement was made, that they were not selling the judgment, but making a compromise settlement with Counts presumably in order to assist him.   In the letter of Counts dated December 29, 1917, he says, "I am not worth anything in land or personal property (not one dollar), but, in order to get matters adjusted, I can get you $35.00 for your judgment," inclosing a blank transfer.   In remitting the $35, Putnam, the salesman to whom it was paid, wrote the company, inclosing check, "settlement in full of the Counts-Taylor note."   The assignment was executed and returned to Counts.   Graham's name appears as assignee.

(7) Judgment of Mitchell-Lewis Motor Company, March 20, 1914, $1,447.47: The secretary of the company testified that the proposition from Counts was a compromise of the judgment at 10 cents on the dollar.   The request came from Counts, who offered to compromise at that figure upon the representation that he was insolvent and that a friend of his was furnishing the money for him to buy the judgment at 10 cents on the dollar; that no one else made any representations.   On February 6, 1918, Counts wrote to the company:

"I have a friend who is furnishing me the money to buy up the judgment against me.   I have succeeded in getting all of the judgments older than yours, namely, [naming the creditors in judgments 1, 2, 3, 4, and 6 as mentioned above].   All of these judgments were sold at ten cents on the dollar and I am writing to know if you will take that.   That's all the money this party will advance.   I have not a cent of my own, real or personal."

On March 1, 1918, the company replied, accepting the proposition made by Counts.   On March 4, 1918, Counts remitted check for amount of settlement $136.81, inclosing a transfer for the company to sign.   On March 9, 1918, the company acknowledged receipt of the check, demand-

ing $8.43 more, and promising to mail transfer upon receipt of the additional amount. On March 13, 1918, Counts remitted the $8.43. On March 16, 1918, the company returned to Counts the assignment which he had inclosed, the name of Graham having been inserted. On May 11, 1918, Richey & Richey, as attorneys for Graham, returned the assignment to the company with the request that it be dated and witnessed. Not hearing from the company, Richey & Richey wrote them on June 8, 1918, for a return of the assignment. On June 11, 1918, the company replied, declining to return the assignment until further advised by their attorneys, who they claimed had given information not agreeing with that obtained from Richey of the assignment. On July 6, 1918, the company replied giving very full details of the situation with Counts. Not having a reply thereto, Richey & Richey again wrote the company on July 2, 1918, asking for a reply and a return of the assignment. On July 6, 1918, the company replied curtly without sending the assignment and returning the 13 cents postage inclosed by Richey & Richey. The assignment was not returned, and has been in the possession of the company ever since.

(8) Judgment of C. H. Russell & Sons, March 20, 1914, $2,412.82: Negotiations for the purchase of this judgment were opened on March 8, 1918, by Richey & Richey, attorneys in that particular matter of H. M. Graham. They give a full statement of the affairs of Counts and make an offer for their client of 10 cents on the dollar for the judgment. Several letters passed which are not material. On March 26, 1918, Richey & Richey wrote, advising the creditors that, if they would take 10 cents on the dollar, to make draft on their client, H. M. Graham, for $241.77, attaching executed assignment to Graham inclosed. The creditor drew on Graham as directed, and the draft was returned unpaid. On April 27, 1918, M. W. Dendy wrote plaintiffs, offering the same bid and directing

draft on himself if accepted, and requesting execution of an assignment similar to the one which had been forwarded with Graham's name as assignee. On May 2, 1918, Dendy writes to plaintiffs:

"For various reasons please copy this transfer and send it to People's Loan & Exchange Bank," etc.

On April 29, 1918, plaintiffs executed the assignment and attached it to draft on M. W. Dendy. The draft was paid and the assignment delivered to Dendy.

(9) Judgment of Franklin Buggy Company, March 20, 1914, $319.41: The observations in reference to No. 8 are applicable to this judgment, so far as the opening of negotiations is concerned. The proposition to accept 10 cents on the dollar was accepted and assignment executed as per directions of the attorneys to Graham on March 14, 1918, for which there was paid $50, more than 10 per cent.

(10) Judgment of Navassa Guano Company, March 20, 1914, $1,777.03; Negotiations for the purchase of this judgment were opened on March 8, 1918, by Richey & Richey, attorneys in that particular matter as of H. M. Graham, though they have always been and are still on the record of his appeal attorneys for Counts. They give a full settlement of the affairs of Counts and make an offer for their client of 10 cents on the dollar for the judgment. On March 11, 1918, the company replied, offering to take 25 cents on the dollar. On March 13, 1918, Richey & Richey replied, going further into details and expressing the opinion that creditors in their class would get nothing. On March 14, 1918, the company replied, accepting the proposition of 10 cents. On March 16, 1918, Richey & Richey forwarded check for $198.19 and inclosed an assignment of the judgment to Graham. The assignment dated March 13, 1918, was signed and returned by the company.

We are satisfied that after the inflation of values caused by the war took place, in the winter of 1917 and early part of 1918, the idea was conceived by D. H. Counts to buy up the judgments against himself for a song, and, knowing that they were liens upon the land which he had conveyed and warranted to Mrs. M. A. Owings, recoup a part of his losses out of the very land he had so conveyed. As pertinently observed by his attorneys in their letter to Mitchell Motor Company, June 14, 1918:

"If there had been no war and no high price of cotton and no enhancement in the value of that land, the litigation that is now being had over the land would have never been heard of."

That it was the intention of Counts to buy up these judgments for himself is perfectly apparent from his own statements, many of which have been reproduced above. It was he who opened negotiations for their acquisition, using the tempting, sympathetic argument of a broken merchant anxious to get on his feet again and start with a clean slate. He writes:

"I must remove judgments against me." "Have made arrangements to borrow enough money to pay you 10 per cent." "Should I get six of these judgments I can buy all the goods I need in my line and thereby be on my feet again." "Trying to settle some of the other judgments against me." "I am getting another party to make these payments for me." "A friend is putting up the money for me so that I can go in business again." "I am trying to get back on my feet again to get control of the judgments against me in order that I may do business in my own name." "The Nashville Saddlery Company at Nashville, Tenn, held the oldest judgment, which I bought at 10 cents on the dollar." "But for the kindness of a friend I could make no offer at all." "I will give you 15 cents on the dollar for your judgment." "I am doing this on borrowed

money." "I am going to settle or quit." "I am having to transfer this judgment to a friend of mine." "In order to get matters adjusted I can get you $35.00 for your judgment." "I have a friend who is furnishing me the money to buy up the judgments against me." "I have succeeded in getting all of the judgments older than yours." "That is all the money this party will advance."

If Counts had started out with the intention of simply assisting Graham in the purchase of these judgments against himself, for the benefit of Graham, it is impossible to think that he would so generally and unreservedly expressed his purpose to acquire them for himself, to settle them, to wipe them off of the record, so that his crippled credit should be restored. It would not have accomplished that result for Graham to hold the judgments acquired at a great discount, for his own benefit, for the full amounts. His statements that he had arranged with a friend to advance him the money is entirely consistent with what evidently either was his original purpose. If that was not his purpose, so alluringly expressed to those who hoped to recoup their losses out of future business with one whom they had helped to "get on his feet" again, his acquisition of the judgments was obtained by a deception most reprehensible, in appealing to the generous and hopeful instincts of his former trade. After the acquisition of the judgments by him (he writes to Mitchell-Lewis Company, who held a judgment for $1,447.47 recovered in March, 1914, "I have succeeded in getting all of the judgments older than yours," naming 1, 2, 3, 4, and 6), he evidently changed his mind, and now declares that he never intended to buy them for himself, that Graham was the owner of them, and that he has no interest whatever in them.

We cannot accept this statement, and conclude that Graham and Dendy hold the judgments assigned to them respectively as security only for the amounts advanced to

Counts by them, with interest at 7 per cent. from the dates of the several advances.

As to the balances unpaid upon these judgments— that is the differences between the amounts due thereon and the advances by the assignees—they cannot belong to Counts, for the debt was his, and he is estopped from setting them up against his grantee of the land under a general warranty.

12. What are the rights of the judgment creditors whose judgments were assigned to Graham and Dendy? Of these judgment creditors, numbered 1, 2, 3, 4, 6, 7, 8, 9, and 10, although all of them were made parties to this action, only No. 7, Mitchell-Lewis Motor Company, answered and has any status upon this appeal, and they are in no position to reap any benefit from the holding that the assignments were pretensive. The facts in reference to the Mitchell-Lewis Motor Company's assignment are set forth above. From them it is clear that it was executed under the impression created by Counts that he was attempting to get rid of the judgments so that he could re-enter business; but, not having tendered back the consideration of the assignment, they are not now in a position to claim the benefit of the pretensive assignment. *Levister v. Railroad Co.,* 56 S. C. 508; 35 S. E. 207.

The payment of these judgments was not assumed in the agreement of January 9, 1915, by Owings & Owings. They remained obligations of D. H. Counts; and, when he obtained assignments of them to his friends, for his own benefit, they must be regarded as extinguished, except to the extent of the funds advanced for that purpose by Graham and Dendy.

13. Is Mrs. M. A. Owings (for the firm of Owings & Owings) liable to account for the rents of the Coleman place since January 9, 1915, the date of the

conveyance? Upon the conclusion that the deed was void under both the assignment law and the Statute of Elizabeth, the Circuit Judge decreed that Owings & Owings were mortgagees in possession, and therefore accountable ·for rents. A reversal of that conclusion necessarily involves a denial of accountability for rents. The moment the title passed out of Counts to Mrs. M. A. Owings (for Owings & Owings, as we have held), she, as the legal owner, became entitled to the rents.

It has been suggested that the assignees of the mortgages should not be allowed interest upon the notes after the date of the deed and be held unaccountable for rents also, upon the suggested inequity of allowing them both. The right to rents flows from the legal title; and, if the mortgages are to be kept alive for the protection of the legal title, they cannot be half alive and half dead. The accumulation of interest is due to the inaction of the judgment creditors. The day the title passed from Counts to Mrs. M. A. Owings, or as the creditors contend, to Owings & Owings, the judgment creditors had the right to issue execution and sell the land· subject to the mortgages. They did not choose to do so, evidently for the reason that they did not think it would bring more than enough to pay the mortgages. As shown by the testimony, if they had done so, they would have realized nothing. The title to the land carried the right to the rents. If the creditors chose to wait all these years, throwing upon Owings the burden and risk of farming operations, until land has greatly appreciated in value, it is as much as they can ask that they be allowed to come in now for the difference between the prior liens and what the land may bring. The assignees of the Lucas and Enterprise Bank mortgages, entitled to the shield of these mortgages to the full extent of principal and interest.

14. Is D. H. Counts entitled to a homestead in the Coleman place or in the proceeds of sale thereof? In like man-

ner as in the preceding subdivision, the conclusion that the deed was void both under the assignment law and the Statute of Elizabeth, the Circuit Judge decreed that D. H. Counts was entitled to a homestead of $1,000.00 in the proceeds of the sale. A reversal of that conclusion is likewise a denial of the right to homestead.

The conclusion of the matter is that M. J. Owings, the assignee of the Lucas and Enterprise Bank mortgages, holds them for the protection of the title of Mrs. M. A. Owings (for Owings & Owings) to the Coleman place; that he is not entitled to foreclose them against Mrs. M. A. Owings or Owings & Owings; that H. M. Graham and M. W. Dendy are entitled to enforce by sale the executions issued upon the judgments assigned to them respectively, subject to the amounts called for by the Lucas and Enterprise Bank mortgages with interest to day of sale, for the amounts paid by Graham and Dendy respectively in the acquisition of the judgments, with interest from dates of payments to day of sale; that the owners of the judgments numbered 11 to 19, inclusive, are entitled to enforce by sale the executions issued upon their several judgments, subject to the amounts called for by the Lucas and Enterprise Bank mortgages with interest to day of sale, for the amounts of said judgments with interest and costs; that said judgments shall rank according to their several priorities; that Mrs. M. A. Owings (for Owings & Owings) shall be entitled to an additional protection of $1,000 against said judgments, that being the amount of the homestead to which D. H. Counts was entitled to and which was conveyed by his deed and upon which said judgments were not liens; that Mrs. M. A. Owings (for Owings & Owings) shall be entitled to an additional protection of $1,000, that being a reasonable attorney's fee secured by said mortgages.

A majority of the Court, however, agree with the conclusions of Mr. Justice Osborne in reference to the judgments numbered 3, 8, 9, and 10, and to that extent the foregoing opinion is modified.

The judgment of Lummus Gin Company is decreed to have been satisfied by the agreement of January 9, 1915.

The judgment of this Court is that the judgment of the Circuit Court be affirmed so far as a dismissal of the first case, that of M. A. Owings against H. M. Graham and others, is concerned, and reversed as to the second case, and that the case be remanded to that Court for such further proceedings as may be necessary to carry into effect the conclusions herein announced.

Mr. Justice Fraser concurs.

Mr. Chief Justice Gary and Mr. Justice Watts: For the reasons assigned by his Honor Judge Frank B. Gary, we think the exceptions should be overruled, and judgment of Circuit Court affirmed.

Mr. H. K. Osborne, Acting Associate Justice (concurring and dissenting) : After the most careful and painstaking consideration which I have been able to give to the very complicated situation disclosed by this record, I concur with Mr. Justice Cothran in his conclusions on all the matters involved, with the exception of the following:

His conclusion is that all the assignments of the judgments which are discussed by him under his proposition No. 11 to Graham and Dendy were really obtained by Counts himself, for himself, and that the assignments to said parties are pretensive merely, and, further, that the legal effect is that the said judgments are to be regarded as paid and their liens destroyed, except as to the sums advanced by Graham and Dendy, respectively. I concur in these conclusions in so far as the same apply to the assignments of the judgments of the following: (1) Nashville Saddlery Company; (2) Parker Manufacturing Company; (4) Hughes Buggy Company; (6) Georgia Chemical Company; (7) Mitchell-Lewis Motor Company.

In each of the above the correspondence in the record, quoted at length by Judge Cothran, shows that Counts at least pretended to be trying to get rid of these judgments

so as to relieve himself of the embarrassment of them in a business way. The arguments which he used to induce the judgment creditors to surrender and transfer their judgments for the small percentages offered were calculated to and doubtless did have the intended effect of creating the belief in the minds of creditors that Counts was acting solely for himself and for his own personal benefit in the matter, and that he was adopting this method of entirely getting rid of these outstanding judgments, as his letters indicated, even though the assignments were executed containing the name of Graham. They may well have thought that this was a legal method adopted by Counts for accomplishing his pretended purpose.

Graham testified (to which Counts agrees) that Counts undertook to buy up these judgments for Graham; that Counts was Graham's representative in the matter. If so, then Graham should be bound by the representations made by Counts, and by the pretenses by which he secured the assignments. If it be true, as now contended by Graham and Counts, that Counts had no thought of buying up and paying off these judgments for his own benefit (which is contradictory of Counts' attitude as disclosed in the letters), then it seems to me the judgment creditors above referred to were victims of deception, and that Mr. Graham ought not to be allowed to profit therefrom. Both parties should be held bound by the representations so made, even though it be shown in testimony that they were deceptive or untrue. Certainly they ought not be allowed to profit by them, if untrue.

I do not agree, however, with Judge Cothran that his conclusions ought to be applied to the following judgments: (3) Montgomery-Moore Company; (8) C. H. Russell & Son; (9) Franklin Buggy Company; (10) Navassa Guano Company.

In these cases most, if not all, of the correspondence with the judgment creditors resulting in the assignments of the

30 S. C.—120.

judgments was initiated and conducted by Messrs. Richey & Richey, attorneys acting on behalf of Graham. In the case of the Russell & Son judgment, which was finally assigned to M. W. Dendy, this was brought about by his son, J. J. Dendy. At any rate, in these cases the judgment creditors were not misled by any pretense of Counts that he was paying off and getting rid of the judgments, but were put on notice that what was wanted were actual assignments of the judgments to Graham and Dendy, respectively, who also furnished the money. I do not feel that the circumstances under which these assignments were obtained were such as to estop Graham and Dendy from claiming the benefits of the assignments, but, on the contrary, they shall be adjudged to be the owners of such judgments respectively.

I think, therefore, that the judgment of this Court should affirm the judgment of the lower Court in so far as it adjudicates the title of the judgments last mentioned above in Graham and Counts respectively, and that said parties should be allowed to enforce said judgments with interest and costs against the real estate mentioned, subject, however, to the amount due on the Lucas and Enterprise Bank mortgages, with interest and costs, and $1,000 attorney's fees, and also subject to the $1,000 homestead exemption of Counts, which was assigned to M. A. Owings by the deed of Counts; that, with the exception of the matters mentioned, the judgment of this Court should be as outlined by Judge Cothran.

*Petition for Rehearing*

MR. CHIEF JUSTICE GARY and MR. JUSTICES FRASER and COTHRAN.

After the first arguments when it appeared that the Court as then constituted was equally divided, a reargument was ordered, the opinion not having been filed, but lodged with the clerk for information of

counsel.   There is therefore no ground for the contention that the judgment below should be affirmed by a divided Court.

Assuming that the appointment of Acting Associate Justice Osborne was irregular, the case of *Holman v. Farrell,* (S. C.) 109 S. E. 886, is conclusive against petitioners, holding that the objection comes too. late.

The other grounds are insufficient, having been carefully considered.

The petition is dismissed.